**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Case No. 1:22-cr-56 (APM)** |
| | : | |
| JULIANO GROSS, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Juliano Gross to 60 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution.

## I.      Introduction

Juliano Gross, 29, who is unemployed, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on August 12, 2022, (ECF No. 21 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Gross pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a sentence of incarceration is appropriate in this case because Gross: (1) posted videos on his TikTok social media account prior to January 6, 2021 encouraging others to go to Washington, D.C. on January 6, 2021 to "get the country back"; (2) marched from the former President's rally on the Ellipse to the Capitol grounds even though his mother returned to her car; (3) observed other individuals climbing walls and moving security fences on restricted Capitol grounds; (4) unlawfully entered the Capitol Building through the Upper West Terrace door as a security alarm sounded; (5) livestreamed his entry and presence in the Capitol Building via TikTok while making statements including "We are in the Capitol Building. Power back to America. We are in the Capitol Building. The Capitol Building has been overthrown. It has been overthrown"; (6) penetrated the Capitol all the way to the Senate Gallery where he continued to livestream to a large audience; (7) loudly encouraged rioters on the Senate Floor to open the doors to permit other rioters to enter; (8) made statements on TikTok during his exit from the Senate Gallery such as, "Our Capitol! Our Capitol! We take back our country today!"; and (9) posted images on his social media accounts during and after January 6, 2021 that glorified the rioters and their conduct and falsely blamed "Antifa" for the rioters' violence.

In addition to these aggravating factors, the Court also should consider that Gross was part of a large and violent riot that relied on numbers to overwhelm police officers who were guarding the Capitol Building, to breach the Capitol, and to disrupt the proceedings. *See United States v. Thomas Fee*, No. 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with … important

democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of his fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators, and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, No. 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Gross encouraged, participated in, and celebrated a riot that actually contributed to the halting of the Congressional certification. His entry into the Senate Gallery demonstrates that a sentence of probation alone is not warranted and a 60-day term of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution is necessary and appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary repetition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 18 (Statement of Offense), at ¶¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Gross's conduct and behavior on January 6.

### Juliano Gross's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Gross traveled with his mother from New Jersey to Washington, D.C. via automobile. *Id.* at ¶ 8. The purpose of the defendant's trip was to protest Congress's certification of the Electoral College. *Id.* Gross also intended to livestream the rally on the social media platform TikTok to raise money through donations from his thousands of followers. *Id.* In

the days prior to January 6, 2021, Gross encouraged his TikTok viewers to travel to Washington, D.C. and "get" the country back."

On January 6, 2021, Gross and his mother attended the "Stop the Steal" rally in Washington, D.C. ECF No. 18 at ¶ 9. Gross then marched with other individuals to the U.S. Capitol Grounds while his mother returned to her car. *Id*. While he was present on restricted U.S. Capitol Grounds, Gross observed other individuals climbing walls and moving security fences. *Id.* at ¶ 10.



*Figure 1: Gross livestreamed other rioters scaling the Capitol walls. Video of this incident will be provided to the Court as Exhibit 1.*

Gross then unlawfully entered the Capitol Building through the Upper West Terrace door at 2:35 p.m. *Id.* at ¶ 11. Gross broadcast his entry into the Capitol Building and his presence there to his viewers on TikTok. *Id.* Gross's TikTok account had 46,500 followers and each of the six videos he streamed from inside the Capitol Building had at least 10,000 views. The final video he posted from inside the Building was viewed 13,300 times. At the time that Gross entered the Capitol, a security alarm sounded from the West Terrace door. *Id.*



*Figure 2: Gross (wearing red baseball cap), enters the Capitol Building through the West Terrace door while taking cell phone video. Video of his entry will be provided to the Court as Exhibit 2.*

Gross walked to the Capitol Rotunda and arrived in the Rotunda at around 2:39 p.m. *Id.* at ¶ 12. Recording his entry, Gross exclaimed, "We are in the Capitol Building. Power back to America. We are in the Capitol Building. The Capitol Building has been overthrown. It has been overthrown." *Id.*



*Figure 3: Gross (wearing red baseball cap), proceeds through the Rotunda while taking cell phone video. Video of his travel to, and presence in, the Rotunda will be provided to the Court as Exhibit 3.*

Gross then proceeded past the Rotunda Door between 2:41 p.m. and 2:42 p.m. and walked

up the stairs toward the Senate Gallery. *Id.* at ¶ 13.



*Figure 4: Gross (wearing red baseball cap), proceeds past the Rotunda Door while taking cell phone video.*

He traveled down the East Corridor to the Senate Gallery. ECF No. 18 at ¶ 13.

6



*Figure 5: Gross (wearing red baseball cap), proceeds down the East Corridor while taking cell phone video.*



*Figure 6: Gross (wearing red baseball cap), captured on YouTube video while inside the Capitol Building.*

Between approximately 2:44 p.m. and 2:50 p.m., Gross entered the Senate Gallery, exited, entered again, and exited. *Id.* at ¶ 13.



*Figure 7: Gross (wearing red baseball cap), enters the Senate Gallery while taking cell phone video.*

In one TikTok video Gross livestreamed from the Senate Gallery, he can be heard yelling at the few individuals on the Senate Floor, "Open the door!  Open the door!" Gross made comments after he left the Senate Gallery including, "Our Capitol!  Our Capitol! We take back our country today!" ECF No. 18 at ¶ 14.





*Figures 8, 9, 10 : Gross livestreamed three videos while inside the Senate Gallery, which will be provided to the Court as Exhibits 4, 5, and 6.*

8



*Figure 11 : Gross's presence in the Senate Gallery is captured by a photojournalist.*

After Gross left the Senate Gallery, he proceeded out of the U.S. Capitol Building. *See* Ex.

7, 8. Documenting his exit from the Capitol Building on TikTok, the defendant stated, "we are

gonna to head out because we just got an emergency alert that they have mobilized the National

Guard, so I'm heading out." ECF No. 18 at ¶ 15; Ex. 8.

During the evening of January 6, 2021, and in the days immediately following, Gross

posted images taken outside the U.S. Capitol Building on January 6, 2021 on his social media

accounts, including those on Parler and Instagram. Gross included comments such as "AMERICA

took over the capital [sic] building," "Yoo. America speaking load [sic] today," and "Antifa is

responsible for the small violence out breaks. Patriots were peaceful!" ECF No. 18 at ¶ 16.



*Figure 12 : Image posted by Gross to his Instagram account.*



*Figure 13: Image posted by Gross to his Instagram account.*



*Figure 14 : Video posted by Gross to his Parler account.*

*Gross's Cooperation With Law Enforcement*

Gross voluntarily met with FBI agents on January 28, 2021 and December 29, 2021, and admitted the conduct at issue in this case. During the latter interview, Gross identified himself in images of two CCTV videos captured during his unlawful entry into the U.S. Capitol Building. *See* ECF No. 1-1 at 11-13. During a voluntary, post-arrest interview on January 18, 2022, Gross again spoke with the FBI and attempted to assist the FBI in identifying individuals who assaulted a member of the media inside the Capitol Building as Gross walked by. Gross showed videos that remained on his cell phone, although none of his TikTok videos were available and none showed the assault.

*The Charges and Plea Agreement*

On January 11, 2022, the United States charged Gross by criminal complaint with violating

18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 18, 2022, law enforcement officers arrested him in Kearny, New Jersey. On February 18, 2022, the United States charged Gross by a four-count Information with the same offenses. On July 29, 2022, pursuant to a plea agreement, Gross pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Gross agreed to pay $500 in restitution.

### III.    Statutory Penalties

Gross now has been convicted of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and Presentence Investigation Report, he faces up to six months of imprisonment and a fine of up to $5,000. Gross must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a period of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Gross's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Gross personally engaged in violence or destruction, he would be facing

additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Gross therefore is not a mitigating factor in this case.

In light of these factors, a sentence of 60 days in prison followed by 36 months of probation is warranted. Gross used his social media influence to encourage his 46,500 TikTok followers to travel to the Capitol on January 6, 2021. Gross had the opportunity to return to his car with his mother after he attended the "Stop the Steal" rally, but instead proceeded to the Capitol Building. He watched as rioters scaled the walls and he heard alarms sounding when he unlawfully entered the Building. Gross then livestreamed his unlawful entry into the Capitol Building and breach of the Senate Chamber to 13,300 viewers. *See* ECF No. 1-1 at 2. During his presence in the Building, Gross encouraged a handful of rioters on the Senate floor to open the doors to let others inside. They eventually did. Gross celebrated that the Capitol building was "overthrown" and yelled that it was "Our Capitol! We take back our country today!" Even after he left the Capitol Building, Gross boasted that the rioters took over the building and falsely claimed that "Antifa" was responsible for the rioters' violence. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

### B.  The History and Characteristics of Gross

As set forth in the PSR, Gross's criminal history consists of a single misdemeanor conviction for which a $75 fine was imposed. *See* PSR ¶ 19. As described above, Gross met with the FBI three times and was cooperative during the investigation and prosecution of his conduct. He promptly entered a guilty plea, acknowledging his conduct and resolving this case. He has been compliant with all conditions of pre-trial release.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Bustle*, No. 21-cr-238-TFH, Tr. 8/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." *United States v. Gallagher*, 21-cr-41 Tr. 10/13/2021 at 37 (statement of Judge Nichols

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

at sentencing). A sentence less than incarceration here would send would-be rioters "that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, [and] then people will say why not do it again." *United States v. Castro*, 21-cr-299 (RBW), Tr. 2/23/2022 at 41-42 (statement of Judge Walton).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss in *United States v. Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [Defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Sent. Tr. 7/19/21 at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was [before January 6, 2021] for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

A lengthy period of probation following incarceration also furthers general deterrence. In

*Lindsey,* Chief Judge Howell explained,

> [M]y standard probationary supervision period that I have been imposing on J6 defendants, in order to ensure that people who are susceptible to believing in conspiracy theories and the "Big Lie" that the 2020 presidential election was stolen and – because of the susceptibility are people who have plainly – have expressed willingness to engage in political violence, that a 36-month period of probation is both important for specific deterrence. And for that particular defendant with that susceptibility to political violence and political action based on beliefs in conspiracy theories that are unfounded and baseless and spurious – and for a general deterrence as well.

*United States v. Lindsey*, No. 21-cr-162(2) (BAH), Sent. Tr. 7/15/22 at 32.

*Specific Deterrence*

The need for specific deterrence in this case is apparent in light of Gross's use of social media to encourage his thousands of followers to "get the country back" on January 6, 2021, his loud instruction to rioters on the Senate Floor to "open the door" to let others inside, and his post-January 6 social media posts falsely claiming that "Antifa" was responsible for the rioters' violence. The Court should impose a sentence sufficient to deter Gross from any future attempt to participate in, encourage, and profit from political violence.

**E.  The Need to Avoid Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants

17

whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended"

nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished

already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the exact same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. The best comparison for Gross is that of four other individuals who pleaded guilty to 40 U.S.C. § 5104(e)(2)(G): Mariposa Castro, who used her social media to encourage and glorify the violent riot on January 6, 2021, and James Little, Janet Buhler, and Anthony Mariotto, three individuals who unlawfully entered the Senate Gallery on January 6, 2021. All four defendants had minimal criminal histories. The government recommended a 60 day sentence for Castro; 30 days' imprisonment, 36 months' probation, 60 hours of community service, and $500 in restitution for Little and Buhler; and a sentence of 120 days in jail and 36 months' probation for Mariotto. *See United States v.* Castro, No. 21-cr-299 (RBW), ECF No. 40; *United States v. Buhler*, No. 21-cr-510 (CKK), ECF No. 35; *United States v. Mariotto*, No. 21-cr-094 (RBW), ECF No. 35.

Mariposa Castro broadcast live, for at least 47 minutes, to hundreds of her Facebook viewers during her presence on restricted Capitol grounds. *United States v. Castro*, No. 21-cr-399 (RBW), ECF No. 40 at 2. She cheered as other rioters attacked officers in a tunnel area near the stage built for the Inauguration, repeatedly announced her intent to "break in," and then

documented her unlawful entry into a conference room of the Capitol Building through a smashed-out window. *Id.* In videos eventually viewed nearly 5,000 times, Castro essentially called upon her social media followers to join her in a "civil war." *Id.* at 2-3. Although Castro, like Gross, did not have a criminal record and only was inside the Capitol Building for a short amount of time, she was sentenced to 45 days' imprisonment. *Id.*, Sent. Tr. 2/23/22 at 44. Judge Walton explained that, "I think a message has to be sent to others that there are consequences … it is my view that in order for people to understand that if you're going to engage in the type of behavior that you engaged in, if you're going to make the statements that you made on that day in reference to what was occurring, and if you're going to disseminate that information to others, there has to be a penalty for it." *Id.* at 43.

Like Gross, James Little saw individuals climbing scaffolding and law enforcement officers trying to disperse rioters who attempted to enter the Capitol. *United States v. Little*, No. 21-cr-315 (RCL), Sent. Tr. 3/14/2022 at 3. After he entered the Senate Gallery, Little took a selfie that he later sent to family and friends, and he remained in the Gallery for a number of minutes. *Id.* at 4-5. Later that day, Little sent text messages boasting, "We just took over the Capital [sic]" and "We are stopping treason! Stealing elections is treason! We're not going to take it anymore!" *Id.*, ECF No. 26 at ¶ 11. Little was sentenced to a 60 day term of incarceration and 36 months' probation. *See United States v. Little*, No. 21-cr-315 (RCL), Sent. Tr. 3/14/2022 at 60. Judge Lamberth explained that he exceeded the government's sentencing recommendation because he believed that "some term of imprisonment is essential in these cases now to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense." *Id.* at 59. Judge Lamberth imposed a three year term of probation due to Little's social media

comments about January 6 that suggested Little would resort to the same action during another election cycle. *Id.* at 60.

Janet Buhler ignored the sounds of flashbangs being detonated, plumes of smoke, rioters climbing the scaffolding and tearing down tarp covering the Northwest Staircase, and shards of glass scattered near the Senate Wing Door. *United States v. Buhler*, No. 21-cr-510 (CKK), ECF No. 35 at 2. She cheered as rioters crushed U.S. Capitol Police officers at the East Rotunda Doors, and deleted photographs from her phone detailing her time inside the Capitol Building. *Id.* Her attorney argued that her lack of criminal history and dedication to community service counseled for a less severe sentence. *See https://lawandcrime.com/u-s-capitol-breach/utah-piano-teacher-who-cheered-and-applauded-when-the-rioters-broke-through-on-jan-6-sentenced-more-harshly-than-former-cop-son-in-law/* But Judge Kollar-Kotelly adopted the government's recommendation, sentencing Buhler to 30 days' imprisonment because, "This is a serious offense … Buhler cheered and applauded when the rioters broke through the east rotunda doors … This certainly would have encouraged and egged on the rioters." *Id.* Moreover, Buhler "was in the Capitol for the 28 minutes, [a]nd she went in shortly after it was breached." *Id.*

Judge Walton sentenced Senate Gallery trespasser Anthony Mariotto to 36 months' probation, but no jail time. *United States v. Mariotto*, No. 21-cr-094 (RBW), ECF No. 39. Mariotto entered the Capitol through the Senate Wing Door, as he and others chanted, "Where are the traitors?" https://www.tcpalm.com/story/news/crime/st-lucie-county/2021/12/17/anthony-tony-mariotto-serve-probation-jan-6-capitol-case/6508353001/. He watched as officers were overrun before entering the Senate Gallery and taking cell phone video and a selfie that he posted on his Facebook account. *Id.* Mariotto later provided a post-arrest interview to a local news station,

minimizing his conduct on January 6. *United States v. Mariotto*, No. 21-cr-094 (RBW), ECF No. 35 at 2.

Gross's conduct was more egregious than that of Castro, Little, Buhler, and Mariotto. He encouraged his 46,500 social media followers to "take back our country" and livestreamed his unlawful presence in the Capitol Building and Senate Gallery to over 10,000 viewers. His social media reach was far greater Mariposa Castro's. He cheered the riot and encouraged others to open the Senate Floor to rioters, which sets him apart from Buhler, who cheered and applauded the completed breach of the east rotunda doors. Gross also had the opportunity to return with his mother to their vehicle but chose to press on to the Capitol. *See, e.g., See United States v. Rau*, No. 21-cr-148 (JEB), Sent. Tr. 9/29/21 at 17-18; *United States v. Jancart*, No. 21-cr-467 (JEB), Dent. Tr. 9/29/21 at 23 (finding significant that January 6 defendants left their hotel to travel to the Capitol once they learned that it had been breached). But Gross apparently did not witness as much violence as did Castro, Mariotto, and Buhler, and his presence in the Capitol Building seems to be motivated in large part by an attempt to monetize his social media influence. In his interactions with law enforcement officials and his conduct while under criminal charges, Gross was cooperative.

## V.   The Court's Lawful Authority to Impose a Split Sentence

Section 3561(a)(3) allows for the imposition of both a term of probation and a term of imprisonment for a single Class B misdemeanor. As Judge Lamberth held in *Little*, that statute permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses. *United States v. Little,* 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022), appeal pending, No. 22-3018 (D.C. Cir.). A number of other judges in this District have adopted the same

position. *See, e.g., United States v. Sarko*, No. 21-cr-591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21-cr-342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF No. 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, No. 21-cr-630 (CJN), ECF No. 37 (D.D.C. Apr. 22, 2022) (same); *United States v. Entrekin*, No. 21-cr-686 (FYP), ECF No. 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, No. 21-cr-281 (JEB), ECF No. 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, No. 21-cr-607 (EGS), ECF No. 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, No. 21-cr-601 (JDB), ECF No. 40 (D.D.C. July 15, 2022) (same).

Gross pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see also United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years of probation).

## VI.   Conclusion

For the reasons set forth above, the government recommends that the Court sentence Juliano Gross to 60 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution. Such a sentence acknowledges his prompt acceptance of responsibility, but still reflects the seriousness of Gross's criminal conduct on January 6, protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

24

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052

By:     */s/ Jordan A. Konig*
        JORDAN A. KONIG
        Supervisory Trial Attorney,
        U.S. Department of Justice
        Detailed to the U.S. Attorney's Office
        For the District of Columbia
        P.O. Box 55, Washington, D.C. 20044
        202-305-7917 (v) / 202-514-5238 (f)
        Jordan.A.Konig@usdoj.gov